Next case is United Gilsonite against Investor Commission 410-0523. Counsel, please. May I please report, Counsel? My name is Igor Powers, and I represent the United Gilsonite Laboratories. This is an appeal of an occupational disease case and a commission finding that petitioner Mr. Bergman was exposed to particles or dust which caused his respiratory condition. Specifically, Mr. Bergman is alleging or has alleged that his respiratory condition, which includes sarcoidosis, is related to his exposure to silica and titanium dioxide. As I'm reading the arbitrator's decision last night, which is pretty lengthy, I'm reading his conclusions. I think it's important that we go over what actually sarcoidosis is as opposed to what an occupational disease is. I'm reading that decision from Arbitrator Tobin last night, and I'm going, I think he's treating sarcoidosis as if it is in fact an occupational disease. Sarcoidosis causes the development of granules in the lungs. It's an inflammatory process. It's unknown whether it's genetic or if there's a genetic disposition for it, but it does run in families, and in this particular case, Mr. Bergman's sister also suffers from sarcoidosis. The cause of this condition is not known. It's not like an occupational disease, silicosis. You get silicosis from exposure to silicon. It's a fibrotic disease. You get black lung disease from exposure to silicon. These are things that medicine has determined over the years. They have not been able to determine the cause of sarcoidosis. It is also a diagnosis of exclusion. If you have a granular disease and it's related to an occupational exposure, then it's that disease. If you can't determine that there's an occupational disease, then the diagnosis is sarcoidosis. You can't, as Arbitrator Tobin and the Commission did here, say that this exposure caused sarcoidosis and that occupational disease. You only use sarcoidosis as a diagnosis when, in fact, you can't find another cause. I think it's important to do that because I believe the Commission failed when they assessed this matter as to what Mr. Bergman's real condition was. I don't think they looked at... Was there medical testimony that if it was sarcoidosis that he was triggered by his exposure to dust? That is Dr. Eagleton. Dr. Eagleton came up with, and I'm trying to understand, Justice, the distinction between something triggers it and something causes it. It sounds to me like he's trying to say it causes it, but if you look at what he relied upon to say that it triggered it, the triggering was a significant exposure to silica. He thought that that would be reasonable if he had inhaled a significant amount that that could trigger the sarcoidosis. Now, he also said that silica and titanium dioxide, and actually Dr. Seuss said this as well, both those things do not cause sarcoidosis. So when he says it could trigger it if he got a reasonable amount of inhalation, a large dose, I'm kind of lost, especially considering the fact that the condition is unknown. If you don't know the cause of it, how do you know what triggers it? There's also medical testimony that it's not sarcoidosis, it's silicosis or pneumoconiosis based on titanium dioxide exposure, right? And if I may, the first, silicosis. He doesn't have any, there's nothing out there in terms of evidence other than the suspicions by Dr. Eagleton and initially by Dr. Seuss that he may have silicosis. It was ruled out. Dr. Seuss ruled it out. Dr. Pigel ruled it out. And why did they rule it out? He doesn't have fibrotic disease. He has a granular disease, right? So he doesn't have silicosis, even though at the very end, after the second deposition, Dr. Eagleton goes back over again and says he's got sarcoidosis and he's got silicosis. There's no basis for that. There's nothing medically, scientifically to say where's the fibrosis? Where is the silicosis? So there doesn't appear to be any question that he inhaled some of these particles. I mean, there was a biopsy done, which indicated there were some particles, silicon or titanium in his lungs. So why is this not compensable? Well, first of all, that's from Dr. Abraham. He got the paraffin block, just like Dr. Pigel got the same paraffin block, just like Dr. Mann, at the request of Dr. Eagleton, looked and did a microscopic exam. Dr. Pigel says, few particles. Dr. Mann, no particles. And then we have Dr. Abraham, who was retained for third-party litigation by Mr. Berg's attorney, and he finds these particles. I couldn't ask him about that. I couldn't question him about that, which I think is an abuse of discretion, and I think it's an abuse to allow Dr. Eagleton to rely upon that. But there is a question as to whether there are particles there. Why couldn't you question Dr. Abraham? Because he was not made available for the deposition. But did you request to take his deposition? Yes. And the evidence will show that for a long period of time, when a request for a continuance of the trial was made, the reason was going to depose Dr. Abraham. That was counsel's response. The petitioner was going to depose. Yes. But did you request to take his deposition? Yes. And what happened was that when he then wanted to use that report without a deposition, I objected. And then we had, I think, two of us, a hearing trainer, dealing with that issue in terms of – and, you know, the arbitrator said, it's hearsay, and I'm not letting the report in, and then it gets to – but you waived it. And it's like, well, I didn't waive anything because I gave that report to get a look at based upon the fact I'm being told that he's taking Dr. Abraham's help. It wasn't treatment, so that's not part of the exception to hearsay. This was done, it was retained for the purpose of litigation. The commission found specifically that the claimant was exposed to silica dust and titanium dioxide during his employment. Did they find that? Did what? Did the commission find that the claimant was exposed to silica dust? That he was exposed. And they found that it was causally connected – exposure was causally connected to his condition of ill-being. Right. So you're saying there's no evidence in the record to support that, obviously. I'm saying that the diagnosis that was made either by Dr. Eagleton, which is in fact sarcoidosis because he doesn't have silicosis, so that's not it. And then Dr. Sood, the titanium dioxide pneumoconiosis, it's not competent medical testimony. This diagnosis is absolutely unbelievable. Dr. Sood said it was a very rare condition. Think about this scientifically. We have a doctor, it's extremely rare. He had never seen it before. He had never even heard of it before he saw Mr. Bergman. As a matter of fact, 99% of pulmonologists don't even know about it. That's pretty rare. And it gets even better. It's his first diagnosis of it. You cannot differentiate it pathologically from sarcoidosis. So you look at it and you go, this is sarcoidosis. How do I defend that? How do I question him about the fact that it's the same thing? If it looks like it, if it smells like it, it sounds like it's sarcoidosis. It doesn't sound like it's titanium dioxide pneumoconiosis. And keep in mind, titanium dioxide is an inert substance, meaning that it doesn't irritate tissue. And a granular disease, the main thing about a granular disease is reaction with tissue. Now, in addition to those things, Dr. Sood also knows you don't even need to have a dosage level. And he doesn't care about the material data sheets, which note that there's no connection or association that's been found between titanium dioxide and a pneumoconiosis. And finally, he then goes on and talks about the fact that he's got the diagnosis and he needs to confirm it, but he hasn't done a test to confirm it. So what we're dealing with is a situation where, from his view, he tells me he was exposed to titanium dioxide. Well, that's not really disputed by you, is it? Well, it's disputed in terms of what he was actually exposed to, because you have to remember in terms of the layout of the plant, he's basically down in the production level. The mixing is going on on the second level. There was no titanium dioxide on the production level. When it came down in the production level, obviously it was a liquid form. It was all mixed up. So it's not powder anymore. The evidence is that he wasn't always down in the production level. Well, he tried to say he was up there all the time, but then he, as well as Mr. Neff, who also worked in the maintenance department, and they both did the same job. Every six to eight months they had to replace the belts. Every month they had to do a little job. And then maybe a major breakdown, I think, every once a year or something like that. He wasn't up there that often. He was not up there that often. So I'm trying to pin down your position. Your position is he doesn't have any condition of ill-being, or the doctors all have it wrong. No, no, no. I think that it's significant. He does have a condition of ill-being, obviously. He has sarcoidosis. He believes he has sarcoidosis. That's the last thing he says. The last thing I do, I have sarcoidosis. Sarcoidosis is not an occupational disease. It's a personal condition. The fact that he was exposed to the silica or the titanium dioxide is not relevant. It's not relevant because sarcoidosis, as the doctors noted, sarcoidosis is not caused by exposure to those chemicals. So it was filed under the wrong end. No, I don't think he was. No, he doesn't. He has a personal condition. It's a very personal condition. It has nothing to do with his work. Well, I think it's significant that his sister has the same condition. That would mean that, yes, there's a link there. It's not related to work. Is there evidence here by the medical professionals that sarcoidosis is a diagnosis of exclusion? I'm sorry, what was the first part you had? I'm sorry. Explain the concept, your understanding, of a diagnosis of exclusion. From my understanding, and it's dealt with either both Dr. Pigalle or Dr. Suh, the truth is that when you have a condition and it has certain features, if you're a physician, in this case a granular condition, that's supposed to have brought it, you will look for what could be the potential causes for it. And you obviously will look for causes, where do you work at, what do you have at your house, what do you do, you know, whatever. Things that you may be exposed to determine why are you getting this irritation in your lungs, why are you getting this granular. Once that's been looked at, and you can't determine that it's due to work or it's due to your hobby or whatever, what's left is, that's what's left. You have sarcoidosis. You exclude everything else. And so we don't know what then the etiology of sarcoidosis is. That's the problem with the condition. We don't know the etiology of it. That's your argument. Huh? That's basically your argument. Wait a second. And the evidence shows that that's what he has. Doctors, look, we can't get Dr. Eagleton who treated him with Dr. Seuss, they're not on the same page. They don't have the same diagnosis. And by the way, Dr. Seuss says if he doesn't have titanium dioxide pneumocortisosis, what he has is sarcoidosis, a personal condition. To me, looking at their testimony, I don't consider it to be competent evidence. I also believe that if you allow this type of decision where they're not producing scientific evidence to demonstrate what his condition is, that you're going to have cases before you coming in under the impression that sarcoidosis is now an occupational disease. Well, isn't what Dr. Seuss said that if you have a person with this type of granulomas and you rule out other causes such as metal exposures or whatever, and you can't come up with any exposure, then you call it sarcoidosis. Correct. But here he says there was exposure to titanium dioxide and silicosis, and Dr. Seuss, in fact, says that's what caused it. Correct. That's his opinion, but again, going back to what he said, it's extremely rare. He didn't even know it existed. Ninety-eight percent of hominologists don't know it exists. It looks just like sarcoidosis. But what he said is it all looks like the same thing, and if you can't come up with any other reason for it, you call it sarcoidosis. That was what he said. Well, you have to call it. It's a natural disease. I mean, a lot of people out in the world here have sarcoidosis. It's just a personal condition. It has nothing to do with any exposure. It's just something that you carry inside you. Blacks are more susceptible to get it. Recently, Bernie Mac, I think he had it. He died.  Eastern or northern Europeans tend to carry that as well. Also, Dr. Soon testified that it was debatable whether sarcoidosis, people were genetically predisposed to the condition. He didn't really buy into that, did he? No, he did not, and neither did Dr. Pugel. Dr. Pugel said that it tends to run in families, the features of it, but it's not like they've been able to demonstrate that you're genetically predisposed to it. So, really, we've got various doctors on both sides all over the board. And that's part of my argument. No one's in agreement. Your time is up, Counselor. Thank you, Ron. You may have time to move on. Counselor, please. Counsel, may I please record John Bichardi for the employee here, Mr. Bergman. Mr. Bergman, I think, carried his burden of proving that he was exposed to a number of different particulates, including silica sand as well as titanium dust. I believe the evidence is fairly detailed with respect to his activities in and around the plant, his exposures, his lack of protection, and the fact that his... Well, all that's all well and good. I think we agree with you there. But you have to do more than that. You have to link up exposures to condition. Well, I think we did that. I thank Dr. Eagleton. Okay, now let's deal with Dr. Eagleton. What did he actually say? Dr. Eagleton testified that he was initially unsure of the condition, the cause of the condition. He was originally tested. As you know, medicine is an art. They eliminate causes of conditions. He was eliminating bacterial, fungal, and viral conditions, tuberculosis, which is the type of presentation that one might see in the lungs of this type. Those were eliminated. He then turned to the workplace, the occupational exposure, and began suspecting that there was an occupational exposure and diagnosed the condition as a sarcoidosis because he did not have evidence or actual knowledge of what the offending material was. I believe at that time or around the time that Dr. Eagleton made that conclusion, he then retired from the Pike County area. The petitioner requested to be returned to work because he could no longer stay off on disability and return to work, and his condition worsened. He then came under the care of Dr. Sood. Dr. Sood was, at the second date of disablement, he came under the care of Dr. Sood. Dr. Sood has some specialized training in occupational medicine. He investigated in a little bit more detail the petitioner's exposures. He concluded that the petitioner had some damage to his lungs. He did not know whether it was sarcoidosis because his diagnosis of exclusion was, if I can find a reason for this appearance, it's not sarcoidosis. He suspected titanium dioxide pneumoconiosis. It was his opinion, based upon the silica, the evidence of the silica, that he could find that there was silica-caused sarcoid-type factors, not silicosis. And there's never been a diagnosis by any treating doctor of the silicosis, and we're not alleging that. He then suggested that, based upon what he knew of the work experience, based upon the petitioner, the employee's testimony, his statements to him, the material safety sheets, the other documents that were given to him, he could conclude with a reasonable degree of medical certainty that he had a titanium dust pneumoconiosis. He felt it would be a good idea to confirm that through the biopsy and a special electron-magnetic microscopic examination of a certain tissue. His health insurance wouldn't pay for that. Subsequently, the third-party attorneys did get that done. At some point in that process, Dr. Krugel was asked to review that report, or it was provided to him by, I believe, counsel's predecessor attorney, and asked to comment on it. And Dr. Krugel did. He actually decided that he was going to have his own biopsy, his own films done, by Dr. Yeldani. Dr. Yeldani did a different type of examination under a different type of test, but she even, I believe it's a she, confirmed the presence of titanium dioxide particulates, which is a metal, and silica sand. I believe the test that Dr. Yeldani did was a little bit less sensitive, so it might not have picked up the number or a way for there to be an estimate of the number. That established the presence of those materials in his lungs. And I believe Dr. Su felt that if that test ultimately was done and it showed those particulates, he would then move away from a dilated diagnosis of sarcoidosis to a firm diagnosis of titanium dioxide pneumoconiosis. Now, that would then bring us to the testimony of Dr. Abrams and, I believe, Dr. Eagleton. Dr. Kugel was deposed. He testified about these tests. We then requested to take the deposition of Dr. Eagleton. I believe we sent him some, a Dr. Abrams report, and we asked for a narrative summary, a narrative report asking his opinions. At that point, I believe there was a pretrial conference held with the judge where these discussions with Dr. Abrams report, the objections, and I believe that there was some suggestion about, at some point, Dr. Abrams trying to be deposed or going to be deposed. That did not occur. Well, we seem to be digressing. Let me just ask you a very poignant question. Which particular occupational disease are you alleging your client is suffering from? Both, and I know that may seem inconsistent, and I apologize. I'm not really arguing that's inconsistent. I don't believe it is, and I believe the medical testimony shows that it's not. Sarcoidosis is, by the medical literature, as you can see by the doctor's testimony, and there may be some medical literature in Dr. Kugel's testimony, it is a known genetic predisposition. So it's not an occupational disease? No. He's right about that. It's not an occupational disease. It's a preexisting condition. He's right about that. Yes. Amazing that you can find out on the record. Go ahead. It is a condition which can be triggered by certain airborne particulates. So it can have an aggravation. Exactly. An aggravation of that condition causing it to become symptomatic, causing that process to begin, the damage to occur, and it's a progressive disease which cannot really be abated. And that's why we believe that the commission's decision is correct, that it is a sarcoidosis based upon the medical testimony, the medical literature, Dr. Kugel's testimony and admissions, and Dr. Eagleton's, as well as Dr. Sood's. So, in essence, you're saying the work aggravated a preexisting condition. With respect to the sarcoidosis. Right. But we also believe that we've established a titanium dust pneumoconiosis because Dr. Sood's opinion, I think, establishes, hey, look, if we actually find this stuff in the lungs, that's what my diagnosis is. It's, you know, I don't know whether this, there's such a thing. So you've got two theories of his condition of ill-being. Right. But to summarize it up. Which are both compulsive. Which are both bringing this under the purview of the act. Yes. Okay. Because if you find it in your lungs, it could be the pneumoconiosis by one doctor, the argument is the sarcoidosis, whatever you want to pronounce that. Okay. It triggers or aggravates a condition, a preexisting condition or susceptibility to that disease. Okay. Whereas pneumoconiosis, you remove them from the dust. Presumably it stays at a steady state. Once you trigger sarcoidosis, it progressively gets worse. Exactly. And I think that that is what Dr. Eagleton said. Well, doc, I have a problem. I don't know if I do have a problem. What did Dr. Eagleton say? Well, what I was going to mention, the particular aspect of his testimony and Dr. Suh's, is that it's not dose dependent. And none of the doctors felt it was dose dependent. And I think that it's a progressive disease. And I think all of the doctors believed it was progressive. Sarcoidosis. Well, the state of his lungs. The sarcoidosis that he had, yes. Well, to answer his question, didn't Eagleton specifically opine that the silica kicked it off, he testifies he has a combination of sarcoidosis and pneumoconiosis, correct? Yeah. That's what he says. Yes. All right. But how did he give his opinion, though? I mean, what did he do to a reasonable degree of medical certainty? I believe... What did he do to a reasonable medical certainty? We had that discussion this morning. We did. Can you answer the question? I don't want to go on the record as giving testimony. Whether he testified to a reasonable degree of medical certainty or whether... What's the object of the reasonable degree of medical certainty? The object is to obtain an opinion based upon medical training, experience, and general medical knowledge. Is that what he was asked to base his opinion on? I believe it was. I think we asked him. What if he said could have? And I think might or could have is also accepted, according to case law, in terms of more probably true than not. The doctors could testify to that. I don't agree with that. You don't agree with that? Absolutely not. Might or could have is competent testimony to establish that a given mechanism could cause a result. It is not competent testimony to establish that it did cause it. Something else must be offered in evidence in order to establish the proximate cause. Ice skating could cause a broken leg, but in fact the broken leg was caused by an auto accident. So, you know, might or could have is wonderful evidence that a mechanism can result in effect, and it's especially useful when your opponent is denying that a certain mechanism could cause this effect or inhalation of this material could cause this disease. But it doesn't establish that it did. Think of the difference between theory and actuality. One calls for theory. The second one causes to establish in reality what happened. I don't recall that being subject to much debate. I thought Dr. Eagleton was of that opinion, that that was his conclusion once he had seen Dr. Suit's testimony, that he arrived at that opinion as well. In any event, that was his opinion. Yes. I believe it was. And I believe the commission... He's saying it's possible. It's really what we come down to, if that language is accurate, that was speculated, was used by Dr. Eagleton, that it's possible. Well, didn't Dr. Eagleton testify to a reasonable degree of medical certainty that the claimant's inhalation of silica was a contributing factor to the development of his sarcoid... Oh, I definitely believe he did. Was, not could have been, or might have been. We're talking about the... Yes, I do. You were here this morning when we were discussing that, I think. I don't think I was. It was a great debate, though. Great discussion. I believe... It's too bad you weren't here. I believe there was a sufficient basis for the doctor's opinions in the law and in his testimony. And I think the commission's findings are certainly not against the manifest way of the evidence. We would ask that their findings on all disputed issues be affirmed. If there's any other questions on the evidence that I've not addressed or that you have specifically that concerns you, I would like to answer those because I don't have an opportunity to come back. Thank you, counsel. Thank you. Mr. Butler. Just a couple of points. Just so it's clear, Mr. Bergman did not have sarcoidosis before December the 19th or around that time period of 1996. So I think it's difficult to say that he had a preexisting condition and that that condition was aggravated. What he developed, according to Dr. Eagleton, was massive amounts of granular or granules in his lungs, which Dr. Eagleton said something acute, and I think it's the way he said it, something acute happened here. There was something that happened big to cause this type of reaction. That's why he brought up a significant exposure. Like his work? No, significant exposure of particles. Okay? Like his work. Let's assume like his work. Okay? The problem is Mr. Bergman denied any significant exposures at work. He denied anything prior to December the 19th, 1996, of inhaling any significant amounts. Did he inhale some? Probably. Was there incidence of significant scenarios that would cause this, according to Dr. Eagleton? I thought he testified that he was exposed to it, generally speaking. No, no, no, no. He talks about being acute. He talks the x-rays being dramatic. Something happened to him. Counsel got upset with him because he kept saying, I recall it was something acute, something big had happened then. Well, what had happened then? What does the evidence show? He had a cold. He had fever. He was spitting up blood on the morning he went to work on that day. He had the chills. All these things are consistent with a bacterial infection, a virus, and Dr. Eagleton said sarcoidosis can be activated by a myobacterial infection, a viral infection, fungus. The initial biopsy report or the pathology report, what does it say? These findings are suggestive of either a fungal or myobacterial infection. And there was no particular matter found? And there was nothing that was isolated on culture, but Dr. Eagleton and Dr. Seward both said that simply because it's not identified doesn't mean it's not there. I have a father-in-law, a couple of them. He had an infection in his liver about three or four years ago. They're doing cultures and cultures. He's sicker than a dog. He's in the hospital. He's not getting any better. They can't identify the bacterial agent to give them the appropriate antibiotic. As much as they tried, they never isolated it. They just came up with that whole plan of antibiotics to treat it. Well, in this case, didn't Abraham specifically find in the biopsy report that there was titanium dioxide in the claimant's biopsy? Did that not happen? I don't know. I never got the chance to even cross-examine this doctor. Didn't he have a supplemental report? Dr. Abraham? Well, Abraham had a report, and Kugel had a supplemental report addressed Abraham's findings. He said that he found very few particles, very hard to identify, and he also talked about that the amount was negligible. But nevertheless, some was found. Yeah, well, Dr. Mann, who Dr. Eagleton, he was the pathologist who actually did the initial biopsy report, he found nothing. How do we have nothing negligible? Lots. And I can't talk and question that doctor. I can't find out what equipment is being used. Now, Dr. Seuss' diagnosis for the titanium dioxide pneumoconiosis is based upon history. It's all said and done. That's what he said. It's based upon the history. And what was the history? He was working around the titanium dioxide, which we know he worked downstairs most of the time, and the titanium dioxide is upstairs. It doesn't come downstairs, all right? And he said it was dusty, very dusty. And then Dr. Seuss got a look at the air quality studies, 1993, 1995, 2002, and said, well, it's not very dusty. Is dust there? Sure there is. Ventilation system was top-notch. Ventilation system, the way it was set up around all the mixers, would eliminate as much as possible any residual powders and dusting during that mixing process. You can't eliminate it all. But certainly they were doing a good job because they were below the threshold level set up by the government. What he had was an acute onset, and Eagleton was smart. Thank you. Your time is up. Thank you.